745 N.W.2d 917 (2008)
275 Neb. 287
Brandon POWELL, Appellee,
v.
ESTATE GARDENERS, INC., and Auto Owners Insurance, Its Workers' Compensation Insurer, Appellants.
No. S-07-855.
Supreme Court of Nebraska.
March 21, 2008.
*918 Jon S. Reid and Molly M. Lukenbill, of Lamson, Dugan & Murray, L.L.P., Omaha, for appellants.
Ryan C. Holsten and Brynne E. Holsten, Senior Certified Law Student, of Atwood, Holsten & Brown, P.C., L.L.O., Lincoln, for appellee.
*919 HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
On August 22, 2005, Brandon Powell was hired by Estate Gardeners, Inc., as a crewmember paid at the rate of $12 per hour. When he was hired, Powell understood that his hours would vary from day to day, but that he would average 50 to 60 hours per week during busy periods. Powell was injured on his first day of work after working 11.25 hours. The only issue in this case is the proper method of determining Powell's "average weekly income," as defined by Neb.Rev.Stat. § 48-126 (Reissue 2004).

FACTS
Estate Gardeners is in the business of residential landscape design, installation, and maintenance. Michael Becker, the chief executive officer and co-owner of Estate Gardeners, testified that the busiest time of the year for the company is from April to July. Then, there is a "slow down" in July and August, followed by a "fall rush" from the end of September into October. Employees would "try to work 40 hours a week typically in the regular season." During busier periods, it was "perfectly feasible" that employees might work 50 to 60 hours a week, Monday through Saturday. Becker explained that this is an "upper limit," however, because it was company policy that employees not exceed 60 hours per week. Employees are occasionally asked to work Saturdays, but they never worked on Sundays.
According to Becker, winter was the most unpredictable time for the company. If the winter was mild, then they worked fairly regularly, but, if not, there were weeks when they could not work at all. The company does do snow removal, paving, and other projects when possible. Becker stated that in the 14 years that Estate Gardeners had been in operation, his employees had never worked continuously throughout the winter at a rate of 40 hours or more per week. Still, if there was work, they would try to keep the "key people busy and employed with us [year round] so that we have them come back the next season." Becker explained that the employees with the most seniority would get the first hours available.
Becker testified that his wife had analyzed timesheets for employees who had worked year round from the period of May through the following March. Becker does not specifically state what years he is referring to, but states that this period involved the "entire year surround[ing]" Powell's injury. The actual data is not in evidence, but Becker testified that the average number of hours per week of these employees who worked year round was "in the 30s."
A letter to Powell from Estate Gardeners' workers' compensation insurer indicates that the average hours of other crewmembers for the week of August 22 to 26, 2005, was 41. The following week's average was 45 hours, but this increase was attributed to the loss of Powell.
Becker stated that at the time he hired Powell, he discussed with Powell the "seasonality" of the work. He made no guarantees about winter work, but indicated to Powell that those "who showed the most initiative and the most promise would be the ones who got those hours in the winter."
Powell had prior experience in the landscape industry and knew that available working hours vary and are somewhat dependent on the weather. According to *920 Powell, Becker told him that while he "could not guarantee hours," he "could give [Powell] approximately 50 to 60 hours a week." Powell stated more specifically that Becker told him he would "typically" be able to work 50 to 60 hours per week. These hours would generally be worked Monday through Friday. Powell was also told that "they occasionally worked Saturdays, but not that often."
Powell's home was located approximately 1 hour 15 minutes from Estate Gardeners' office. Powell explained, however, that he accepted a job with Estate Gardeners over other offers from local landscaping companies because he thought the overtime made the longer commute worthwhile. Powell stated that he was aware that he might not be working 50 to 60 hours per week in the winter, but that Becker "also said there was plenty of work to do in the wintertime" because he had contracts to put in "paver" driveways.
When he was injured, Powell had worked 11.25 hours. A letter from Estate Gardeners' workers' compensation insurer indicates that 2.5 of those hours were consumed by filling out paperwork required of new employees and traveltime to the jobsite. After the injury, Powell waited in the foreman's truck for 4 or 5 minutes until the rest of the crew finished the job and was ready to go home. Estate Gardeners' workers' compensation insurer calculated Powell's average weekly wage in accordance with the 41-hour workweek that Powell's coworkers worked the week Powell was injured. The insurer thus calculated Powell's average weekly wage as $492 and voluntarily paid workers' compensation benefits at a rate of $328 per week. Powell disputed the insurer's weekly wage calculation and filed a petition in the Workers' Compensation Court alleging a weekly wage of $600.
The single judge of the Workers' Compensation Court referred to the testimony regarding Becker and Powell's understanding of the hours Powell would work, as well as the evidence as to the average hours worked by other Estate Gardeners' employees. The judge explained that he had reviewed statements that hours varied from 30 to 50 hours per week. Without delineating the precise basis of his calculation, the judge then concluded that Powell had shown, by a preponderance of the evidence, that Powell's average weekly wage would encompass a normal and customary work period of 45 hours per week. At $12 per hour, this resulted in an average weekly wage of $540 per week and temporary total disability benefits of $360 per week.
Powell appealed the single judge's determination to the review panel. He argued that the average weekly wage determination was in error and that the single judge had failed to issue a reasoned decision pursuant to Workers' Comp. Ct. R. of Proc. 11A (2006). Estate Gardeners and its insurer cross-appealed. The review panel considered the question of Powell's weekly wage to be a matter of law. The panel stated that Powell's contract for hire was for "continuous" employment "in excess of 40 hours per week." It determined that under § 48-126, because the only evidence was that Powell worked 11.25 hours for 1 day before his injury and the evidence was that he would normally work 5 days per week, the panel was obligated to determine Powell's average weekly wage by multiplying 11.25 by $12 per hour by 5 days, for a total weekly wage calculation of $675. Estate Gardeners and its workers' compensation insurer appeal.

ASSIGNMENTS OF ERROR
The appellants assert that (1) the review panel erred in finding that Powell's average *921 weekly wage should be based upon 56.25 hours a week and (2) the single judge erred in failing to provide a clearly and concisely stated explanation of its rationale for its decision.

STANDARD OF REVIEW
The meaning of a statute is a question of law, and an appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law.[1]

ANALYSIS
Compensation for total disability is calculated at 662/3 percent "of the wages received at the time of injury."[2] "Wages," in turn, are defined by § 48-126, which provides in relevant part:
Wherever in the Nebraska Workers' Compensation Act the term wages is used, it shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident. . . . In continuous employments, if immediately prior to the accident the rate of wages was fixed by the day or hour or by the output of the employee, his or her weekly wages shall be taken to be his or her average weekly income for the period of time ordinarily constituting his or her week's work, and using as the basis of calculation his or her earnings during as much of the preceding six months as he or she worked for the same employer. . . . The calculation shall also be made with reference to the average earnings for a working day of ordinary length and exclusive of earnings from overtime; Provided, that if the insurance company's policy of insurance provides for the collection of a premium based upon such overtime, then such overtime shall become a part of the basis of determining compensation benefits.
The parties seem to agree that Powell's job as a landscaping crewmember was nonseasonal[3] and that it was continuous.[4] Neither party challenges the review panel's conclusion to this effect. For purposes of this appeal, then, we assume that Powell's employment was nonseasonal and continuous and, like the parties, focus our analysis on the last two sentences of § 48-126, which describe the method of calculating average weekly wage for nonseasonal, continuous employees who are paid by the hour.
The question presented is how to calculate an "average weekly income" for an hourly employee when that employee's contract for hire contemplated a varying number of hours and when the employee was injured on the first day of work. This is a question of statutory interpretation, which, as a question of law, is determined by our court independently of the courts below.[5]
Powell argues that the review panel was correct in extrapolating an average weekly wage from the number of hours of Powell's 1 day of work, by multiplying these hours *922 by Powell's expectation of working 5 days per week. According to Powell, this calculation method is mandated by § 48-126 when it states that average weekly wage should be calculated "using as the basis of calculation his or her earnings during as much of the preceding six months as he or she worked for the same employer."
We disagree. As noted by the court in Riley v. Indus. Comm.,[6] provisions basing an average wage on past earnings presuppose the usual circumstance where the claimant has been employed during the period upon which the average is calculated. This is not to say that a calculation cannot be made when the employee has not worked for the full preceding 6 months described in § 48-126. In a case such as this, however, where the employee has worked less than even a single week, it is impossible to calculate an "average weekly income" based simply upon "as much of the preceding six months as he or she worked for the same employer."
An "average" is generally obtained by adding several quantities together and then dividing this total by the number of quantities.[7] But even if we were to accept an "average" based on a single quantity, that quantity under § 48-126 would be a week and not a day. We do not have even 1 week from which to base an average weekly wage in this case. The court in Miller v. Industrial Commission,[8] in considering a provision fixing compensation upon the employee's average monthly wage, similarly explained, "The import of the word `average' . . . is that there must be a base period of more than one month upon which to determine a claimant's wage."
What Powell supports, and what the review panel did, was not to determine the average weekly income based upon "as much of the preceding six months as he or she worked." The court instead assumed that Powell would have worked exactly 11.25 hours every day of a 5-day workweek without analyzing whether this was in fact likely. The review panel then projected this assumption into the past to create an average weekly income through a mathematical calculation it apparently believed was mandated by the plain language of § 48-126. We conclude that by conducting such a limited projection, the review panel did not follow the strict language of § 48-126. It also ignored other language of the statute pertinent to these admittedly unique circumstances.
Most workers' compensation statutes in other jurisdictions make explicit provision for scenarios where the employee has not worked for a sufficient period of time for an average income to be calculated based upon that employee's past earnings.[9] The most common type of wage basis statute allows that where the employee has not worked "substantially the whole" of the normal period, then the average wage may be based on employees of the same class working the necessary period in the same or similar employment and place.[10]
In the event that this formula cannot be fairly applied, most statutes also expressly provide a "catchall" provision, allowing *923 other methods of calculation in order to achieve a result that is a reasonable representation of the earning capacity of the injured employee.[11] As explained by Professor Larson, the goal of any average income test is to produce an honest approximation of the claimant's probable future earning capacity.[12] In the case of temporary disability, as opposed to permanent disability, courts agree that at the very least, the goal is to ascertain the claimant's expected short-term wage.[13]
Section 48-126 does not provide direction as explicit as other states' statutory schemes. It does, however, emphasize that the average weekly wage for an hourly employee is to be based on "his or her average weekly income for the period of time ordinarily constituting his or her week's work." (Emphasis supplied.) It further states that the calculation of an average weekly wage "shall also be made with reference to the average earnings of a working day of ordinary length." (Emphasis supplied.)
In prior Nebraska case law, we have explained that the addition of the language "`ordinarily constituting his or her week's work'" precludes an automatic mathematical calculation based on the past 6 months' work.[14] Thus, abnormally low output or weekly hours due to illness or vacation will not be averaged in.[15] As explained by the Nebraska Court of Appeals in Griffin v. Drivers Mgmt., Inc.,[16] the "key" to such cases is our emphasis on "not distorting" the employee's average weekly wage.
If there can be no "ordinary" working hours for a particular employee based upon his or her actual, individual work history, then it may be necessary, if possible, to extrapolate an "ordinary length" and a period "ordinarily constituting his or her week's work" from coworkers in the same position for the same employer.[17] Using data from coworkers to estimate the employee's ordinary week's work is simply a fairer approximation, to both employees and employers, than to multiply a single day's hours by 5 days a week when the job contemplates variable hours. The statute does not, as already discussed, mandate an inflexible calculation based only upon the injured employee's work history. Nor does the statute prohibit evidence of similar employees in similar employment.
In Berry v. Walker Roofing Co.,[18] the court was likewise faced with a situation where an employee was injured after completing only a few hours of piecework. The statutory scheme did not explicitly provide the method for calculating an average wage under such circumstances. The court held that it could determine the employee's average weekly wage by inferring the wages the employee "`could have earned.'"[19] The court held that it could make this determination based on the *924 wages actually paid to another employee doing similar work.
In so doing, the court explained that the object of the wage determination is to arrive at a fair approximation of the employee's probable future earning power, which has been impaired or destroyed because of injury. The compensation judge can, of necessity, use only the information that is available. Under the circumstances presented where the employee was injured shortly after beginning his employment, a wage calculation based on the average weekly wage of that employee's coworkers was simply "more reliable than a speculative extrapolation of [the injured employee's] earning capacity based on a few hours of work."[20]
Like other workers' compensation acts, the Nebraska Workers' Compensation Act is designed to compensate an injured worker for the loss of earning capacity caused by the injury.[21] Our court must apply a liberal construction to the act to carry out its spirit and beneficent purposes.[22] Certainly, had Powell been injured on his first day of work on a shortened day during the winter, or had he been injured after only part of his day's work, he would not be urging that § 48-126 must be interpreted to mandate a mathematical extrapolation of that day's work multiplied by 5 days a week. Such a calculation would not be an accurate reflection of Powell's temporary loss of earning capacity and thus would not carry out the beneficent purposes of the act.
We conclude that where the worker has insufficient work history to be able to calculate his or her average weekly income based on "as much of the preceding six months as he or she worked for the same employer," then what would "ordinarily" constitute that employee's week's work and, thus, that employee's "average weekly income" should, if possible, be estimated by considering other employees working similar jobs for similar employers.[23] Where available, such similar employees' work records should be considered for the 6-month period prior to the accident.
From the record before us, we cannot determine the average week's work of Powell's other crewmembers for the 6 months preceding Powell's accident. We therefore reverse the order of the review panel and remand the cause for further proceedings in accordance with this opinion. Having so concluded, we need not address the appellants' remaining assignment of error.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Knapp v. Village of Beaver City, 273 Neb. 156, 728 N.W.2d 96 (2007).
[2] Neb.Rev.Stat. § 48-121 (Reissue 2004).
[3] See, Elrod v. Prairie Valley, 214 Neb. 697, 335 N.W.2d 317 (1983); Hiestand v. Ristau, 135 Neb. 881, 284 N.W. 756 (1939); Hogsett v. Cinek Coal & Feed Co., 127 Neb. 393, 255 N.W. 546 (1934).
[4] Clifford v. Harchelroad Chevrolet, 229 Neb. 78, 425 N.W.2d 331 (1988); Weitz v. Johnson, 143 Neb. 452, 9 N.W.2d 788 (1943); Carlson v. Condon-Kiewit Co., 135 Neb. 587, 283 N.W. 220 (1939).
[5] See Knapp v. Village of Beaver City, supra note 1.
[6] Riley v. Indus. Comm., 9 Ohio App.3d 71, 458 N.E.2d 428 (1983).
[7] See Concise Oxford American Dictionary 55 (2006).
[8] Miller v. Industrial Commission, 113 Ariz. 52, 54, 546 P.2d 19, 21 (1976).
[9] See 5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 93.01 (2007).
[10] See id. at 93-6.
[11] See id. at 93-9.
[12] See id., §§ 93.01[1][e], 93.01[1][f], and 93.02[2][d].
[13] See id., § 93.02[3][d].
[14] Canas v. Maryland Cas. Co., 236 Neb. 164, 167, 459 N.W.2d 533, 536 (1990) (emphasis supplied). Accord Clifford v. Harchelroad Chevrolet, supra note 4.
[15] See, also, Arbtin v. Puritan Mfg. Co., 13 Neb.App. 540, 696 N.W.2d 905 (2005).
[16] Griffin v. Drivers Mgmt., Inc., 14 Neb.App. 722, 731, 714 N.W.2d 749, 757 (2006).
[17] See § 48-126.
[18] Berry v. Walker Roofing Co., 473 N.W.2d 312 (Minn. 1991).
[19] Id. at 315 (emphasis supplied), quoting Johnson v. D.B. Rosenblatt, Inc., 265 Minn. 427, 122 N.W.2d 31 (1963).
[20] Id. at 316.
[21] See Foote v. O'Neill Packing, 262 Neb. 467, 632 N.W.2d 313 (2001).
[22] See Jackson v. Morris Communications Corp., 265 Neb. 423, 657 N.W.2d 634 (2003).
[23] See § 48-126.